| | | |
|---|---|---|
| BRET WADE<br>610 Cathedral Street<br>Apt#3<br>Baltimore, MD 21201<br><br>Plaintiff,<br><br>v.<br><br>ERIN CHANEY FOSTER<br>/a/k/a SOPHIA SUNDAY<br>218 Richmond Dr. SE<br>Albuquerque, NM 87106<br><br>Defendant. | * * * * * * * * * * * * * * * * * | IN THE<br><br>CIRCUIT COURT<br><br>FOR<br><br>HOWARD COUNTY<br><br><br><br><br>Case No. ____________ |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**COMPLAINT FOR DEFAMATION**

Plaintiff, Bret Wade, by and through undersigned counsel, files this Complaint against Defendant Erin Chaney Foster a/k/a Sophia Sunday and alleges as follows:

1. Plaintiff, Bret Wade (hereinafter "Plaintiff" or "Wade"), is and has been at all times relevant hereto, a resident of Baltimore City, Maryland. Further, he is employed at a company located in Howard County.

2. Defendant, Erin Chaney Foster a/k/a Sophia Sunday (hereinafter "Plaintiff" or "Foster"), is currently a resident of Albuquerque, New Mexico. Upon information and belief, the Defendant moved to New Mexico sometime in or about November 2015. Prior to moving to New Mexico, she resided in Maryland.

3. Plaintiff and Defendant are both active in an alternative lifestyle that is known as the "Kink Community" (hereinafter The "Community"). This Community consists of a large, closely-knit group of adults who engage in erotic practices including, but not limited to: bondage, discipline, dominance, submission and other adult-themed activities.

4. The Community, due to the nature of its activities, is very sensitive of matters such as *informed consent*, negotiation, and safety.

5. The Plaintiff is married and the couple further enjoy a polyamorous relationship, as they share their relationship with a partner (hereinafter referred to as the "Partner" and the Plaintiff along with his wife and their partner shall be hereinafter collectively referred to as the "Family").

6. The Plaintiff is well known in The Community. Prior to the Defendant's defamatory conduct, he (a) was a well-regarded educator in *Kinbaku and Shibari (hereinafter referred to as "Rope-Play")*;[1] (b) was a well-regarded educator on consent, negotiation, and safety within The Community; (c) was demonstrating and teaching *Rope-Play* at events throughout Maryland and other jurisdictions. As a result of his experience and proficiency, he earned income, along with invitations to events which saved him and The Family thousands of dollars in event admission

[1] *Shibari* is a general word for tying, Kinbaku is the Japanese art of rope bondage.

reductions, while he taught and demonstrated *Rope-Play and;* and (d) was performing *Rope-Play* for the purposes of live performances and modeling with professional photography, where he earned income.

7. The Plaintiff further led a group in Baltimore known as the "Baltimore Nawa Kai." The Baltimore Nawa Kai, prior to the Defendant's defamatory actions, enjoyed much success and acclaim from The Community in the Maryland and other areas.

8. The Plaintiff further had such a well-respected reputation within The Community that he was able to engage the services of internationally acclaimed masters of the art of *Kinbaku*. Said masters would enter into a business arrangement with Plaintiff to travel to the United States to teach and perform.

9. The Defendant is a burlesque performer who attends and performs at shows in Maryland and, to the best of Plaintiff's information and belief, other jurisdictions.

10. Upon information and belief, the Defendant is employed at a Maryland company known as Ashley Addiction Treatment located at 800 Tydings Lane, Havre de Grace, MD 21078.

11. The parties met at a Baltimore Nawa Kai meeting on or about August 24, 2015 and, after said meeting, they went to Plaintiff's home and participated in *Rope-Play*.

12. Subsequent to their first meeting, the Defendant contacted Plaintiff and expressed an interest in modeling for him.

13. Over the next few months, the parties spent time together and, at some point, the Defendant introduced her husband to Plaintiff. Between September to October 2015, the parties began planning and practicing in preparation for a live *Kinbaku* performance during one of Defendant's upcoming burlesque shows at a major Baltimore venue. During the course of their practices, which were conducted at Plaintiff's home, the parties developed a deep relationship.

14. The parties' deep relationship began to evolve into more involved kink activities. Originally, the Plaintiff and Defendant were not sexually involved. However, as a result of the deep relationship they developed, the parties began exploring other kink activities, along with sexual activities other than intercourse. This included practice where Defendant would remove her undergarments for sexual activities.

15. Prior to her move to New Mexico, the Defendant communicated to Plaintiff that she had agreed with her husband that they would be monogamous and would no longer be involved in The Community.

16. Immediately prior to her move to New Mexico, Defendant invited Plaintiff to a picnic, where she posed for him and flirted with promises to return to Maryland.

17. Defendant clearly intended to continue her relationship with Plaintiff evidenced by continual texts and voice mails while she and her husband drove to New Mexico. Contrary to her claim that she had agreed with her husband to be monogamous, while she was in New Mexico she would continually communicate with Plaintiff that she missed him and desired to be with him. Further, she was sending him pictures of her alone and with other parties while engaged in sexual activities.

18. The Defendant, returned to Maryland on or about July 20, 2016 for, upon information and belief, work-related purposes involving her position at Ashley Addiction Treatment, to visit with family and friends, and for her burlesque performances.

19. During Defendant's Maryland visit she contacted the Plaintiff. The Defendant traveled to Baltimore City to have dinner with the Plaintiff and the Family. They went to a restaurant where they each had 2 or 3 glasses of wine while dining, over the course of 2 hours, starting at 8:30pm.

20. During the parties' dinner, the Defendant informed Plaintiff and the Family that she did not want to drive. Based upon their relationship, the Plaintiff and the Family offered to have her stay at their home for the evening.

21. Defendant requested rope-play during the walk back to the Plaintiff's home.

22. At the Plaintiff's home, the parties encountered the Plaintiff's wife's two adult children. The Parties', along with the Plaintiff's Family, had coffee. Shortly thereafter, while Plaintiff's wife entertained Defendant, Plaintiff escorted the Partner to their bedroom to say good night.

23. At midnight, Defendant joined Plaintiff and the Partner in bed, and when the Partner needed to go to sleep, subsequently joined Plaintiff and his wife in their guest room, where Defendant made numerous sexual advances to Plaintiff and his wife.

24. Plaintiff and his wife clearly informed Defendant that while rope play was allowed, sex would not be involved as Plaintiff's Family would all have to discuss it first and reach agreement. Said discussion did not occur that evening. However, during the rope play, the Defendant continually made sexual advances to the Plaintiff which made Plaintiff and his wife uncomfortable.

25. After the rope play, the Defendant joined the Plaintiff and the Family in bed where Plaintiff slept in his usual spot, between his wife and Partner. Defendant slept next to Plaintiff's wife.

26. The next morning, after Defendant left, she texted Plaintiff. She stated in her text that her husband was

going to be upset that she spent the night with Plaintiff.

27. Defendant's texts to Plaintiff were followed by texts that same evening to Plaintiff's wife. Defendant stated that she was "more drunk than anyone realized" and all she remembered is that she wound up in rope. She further stated that she and her husband had "opted out of kink" after they moved to New Mexico and she would not have agreed to rope play if she was sober.

28. Plaintiff's wife responded that she was present the entire time, that rope play was talked about, and that nothing was done without consent.

29. Defendant communicated again via separate texts to Plaintiff and his wife that her husband was upset and she has to break contact with Plaintiff. She further stated that she "made a bad decision" and she is "paying the consequences."

30. On or about August 9, 2016 the Plaintiff was informed by an internationally renowned Maryland leader (hereinafter referred to as "L"), that the Defendant had accused him of violating her consent on July 20, 2016. L is a well-respected leader in The Community who lives in Maryland. Defendant, instead of contacting Plaintiff, communicated to L her alleged claims.

31. Prior to her allegations, Plaintiff and L enjoyed a partnership in BCB[2], did business together, hosted events together, and generally supported each other. Subsequent to said allegations, L denounced Plaintiff.

32. Upon information and belief, the Defendant further communicated her allegations to other members, event and play space owners and leaders in the Maryland area besides L, prior and subsequent to her online, defamatory statements.

33. The Defendant, on or about August 15, 2016, proceeded to post to the FetLife Listserve[3], under the heading "Consent Violation," inaccurate, disparaging, damaging and defamatory comments knowingly calculated to destroy the Plaintiff's reputation.

34. The Defendant claimed that Plaintiff *violated her consent* as she was intoxicated while rope-play was conducted by her, the Plaintiff and his wife.

35. The Defendant's allegations included other preposterous, damaging and defamatory claims that were extremely sensitive in nature with the knowledge that such lies would inflame The Community. She further stated in her posting that had she been sober, "I would have reminded my former rope partner (Plaintiff) that my husband and

[2] Bondage Club Baltimore (BCB) - a rope play education event whereby Plaintiff and L worked to educate The Community.
[3] FetLife is an online social network for The Community. It is similar to Facebook.

I were not living a polyamorous lifestyle anymore;" despite her actions and communications to the contrary.

36. The Defendant further informed The Community that she had given him a chance to publicly admit her claimed consent violation. However, as he did not, she knowingly made the aforementioned defamatory statements about Plaintiff.

37. The Defendant knew or had reason to know that any allegations of consent violations against an individual in a group as sensitive as The Community would tarnish the individual's reputation despite the individual's denial or the lack of any reasonable proof.

38. The Defendant's statements, were not intended to just tarnish Plaintiff's hard-earned reputation, but based on the severity of her allegations, were knowingly calculated to destroy or annihilate the Plaintiff in the estimation of The Community and deter third parties, such as L and other community members and leaders in the Maryland area to interact or associate with Plaintiff.

39. The Defendant's malicious actions in intending to destroy the Plaintiff's reputation was certainly realized as her defamatory postings were disseminated throughout The Community, particularly within the Maryland area which she targeted. Thus, Plaintiff's reputation in The Community was destroyed, and he was effectively excommunicated or shunned from all sponsorships, hosting, performances, and other events in

Maryland by Maryland leaders, sponsors and members.

40. Plaintiff contends that Defendant's defamatory statements were made in order for her to avoid the "consequences" with her husband that she had described to Plaintiff. Basically, Defendant decided to lie to her husband to perhaps save her marriage and support said lies by publishing the defamatory statements throughout The Community.

41. The defamatory accusations against Plaintiff had the effect that the Defendant was seeking. Due to the sensitivity of The Community, the Plaintiff was ex-communicated. As such, he was shunned from any of The Community events, activities, groups, etc.

42. Defendant's posting on the FetLife Listserve was followed by a large portion of The Community who, via their comments to the posting and their actions, immediately accepted her allegations against Plaintiff as true, despite Plaintiff's well-earned reputation.

43. The Defendant further supported her defamatory statements by initiating and continuing to respond to comments generated from her initial "Consent Violation" posting.

44. It was evident that her "Consent Violation" posting and her follow-up comments were directed at Maryland members and leaders, based upon the hyperlinks after her postings which were specifically directed to Maryland.

45. Following Defendant's postings, the defamatory contents of the postings have been continually discussed and disseminated amongst members and leaders of The Community and any and all of their followers and associates.

46. Plaintiff's subsequent communication to The Community and its leaders denied Defendant's allegations, however, the damage was done. The Plaintiff lost his well-earned reputation.

47. The Defendant's statements were knowingly untrue and defamatory and intended to injure Plaintiff in his professional capacity as a teacher, educator, and performer. The statements were further intended to expose him to scorn, hatred, contempt, or ridicule.

48. The Defendant acted with actual malice, that is, with knowledge of the falsity of these statements, and with the intent to harm Plaintiff's reputation and his standing in The Community when she published these false and defamatory statements about Plaintiff.

49. As a result of the false and defamatory statements published by Defendant, Plaintiff's character, standing and reputation in The Community was irreparably damaged, he further suffered mental anguish, personal humiliation, and the loss of significant business and educational opportunities in The Community, as well as impact to his professional career.

50. Defendant acted with ill will towards Plaintiff and with the intent to injure him.

WHEREFORE, Plaintiff Bret Wade demands Five Hundred Thousand Dollars ($500,000) in compensatory damages and One Million Dollars ($1,000,000) in punitive damages, plus costs and interest.

THE LAW OFFICES OF MARC A. OMINSKY, LLC

Marc A. Ominsky
10632 Little Patuxent Pkwy, Ste 249
Columbia, MD 21044
(443) 539-8712
(443) 539-8726 (Fax)
marc@mdlegalfirm.com

Attorney for Bret Wade

DEMAND FOR TRIAL BY JURY

Plaintiff demands his right to a trial by jury of all issues raised in this case.

Marc A. Ominsky